**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

CIVIL ACTION NO. 22-cv-11399-AK

ROBERT M. ROGERS, Ph.D.,
Plaintiff

V.

UNUM LIFE INSURANCE COMPANY OF AMERICA and UNUM GROUP,

Defendants

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON ALL COUNTS OF COMPLAINT (DOC NO. 8) AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC NO. 22)**

## Summary of Reasons Why Unum Abused its Discretion as an ERISA Fiduciary

In their opening memorandum, defendants Unum Life Insurance Company of America and Unum Group ("Unum" collectively) tell a simple story why they denied paying long-term disability benefits ("LTD benefits") to Mr. Rogers. Unum's arguments, when considered with its one-sided presentation of facts, seems reasonable. But when all facts are viewed through the lens of a true fiduciary, only one conclusion is appropriate: Unum abused its discretion. To accept Unum's arguments requires disregarding that:

- Unum determined that Mr. Rogers was occupationally impaired and entitled to short-term disability benefits ("STD benefits") for a period of 26 weeks after he left work in mid-February 2020 to August 20, 2020. (VIII, p. 3354)[1].

[1] Unum defendants referenced the Administrative Record by the volume number and the applicable page number(s). Mr. Rogers follows the same format. The administrative record of almost 4000 pages is a mess. Even after being warned almost 10 years ago to organize the record, Unum has not changed. *Doe v. Unum Life Ins. Co. of Am.*, 35 F. Supp. 3d 182, 185 (D. Mass. 2014)

- There was no improvement in Mr. Roger's health after August 20. 2020, yet on December 22, 2020, Unum concluded on the same medical records that STD benefits had been paid that Mr. Rogers was not eligible for LTD benefits. (IV, p. 1257).
- Unum disregarded the determinations of Mr. Rogers' treating internist, Dr. Chisholm, and treating rheumatologist, Dr. Ferrante, who both repeatedly responded to written requests by Unum and advised Unum how and why Mr. Rogers was unable to engage in employment of any kind. (IV, p. 1203-05; 1239).
- Unum did not offer a reasonable explanation why the Social Security Administration ("SSA") was wrong when it determined on application that Mr. Rogers was entitled to disability income benefits ("SSDI benefits") (IX, p. 3731) although he was only 39 years old (II, p. 4).
- Unum's administration of Mr. Rogers' FMLA leave concluded during the same period as Unum considered LTD benefit eligibility and as late as July 21, 2022, that Mr. Rogers' need for leave was indefinite, based on a legal and medical review by Unum. (VIII, p. 3275).
- Unum downplayed that its medical examiner, Dr. Rapoport, concluded that Mr. Rogers could do physical tasks of "full-time, light work activity *if his fatigue does not intervene excessively*. (VIII, p. 3168). (emphasis added).
- Mr. Roger's vocational expert, Rhonda Jellinek, explained why his occupation was "medium duty" rather than "light duty" contrasting with Unum's first contention that Mr. Rogers was a chemist (which Unum conceded in litigation was wrong) and why Unum's other classification of Mr. Roger's occupation being only light-duty was faulty too. (IX, pp. 3873-96).

- Unum placed greater weight on the opinions of file reviewing physicians either employed by Unum or retained by Unum who were not licensed to practice in the Commonwealth. (IV, p. 1235; 1240; 1248; IV, p. 3844).
- Unum failed to follow its claim manual and a regulatory settlement agreement where it agreed to defer to the determinations of treating physicians. (.:" (Doc No. 8, pp. 56-57 of 295 and 290-92 of 295).
- Unum never gave consideration to the sworn declarations of: Braxton Sisco, Teresa Rogers, Christina Neusch, Michael Daly and Mr. Rogers. (VII, pp. 2743-48; 2751-53; 2754-55; 2763; 2865-2870). The dates of 2020 on both Mr. Sisco's and Mr. Rogers' declarations are typos and should be read 2021 given the date submitted to Unum. These declarations are the equivalent of direct testimony in an ERISA welfare-benefits case.

Here, Unum "avoided developing and grappling with evidence contrary to its conclusion." *Host v. First Unum Life Ins. Co.*, 569 F. Supp. 3d 48, 59 (D. Mass. 2021). In Host, the court held Unum's conduct was so outrageous, it concluded that "Unum acted in bad faith, and not as a true fiduciary," and was "demonstrably unable to exercise its discretion honestly and fairly." *Id*. at 59-60. Mr. Roger's case is the same. It follows a pattern discussed in

Unum had to provide a "compelling explanation for this stark inconsistency with all of the other evidence of record." *Petrone v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson & Affiliated Companies*, 935 F. Supp. 2d 278, 294 (D. Mass. 2013). Unum failed to engage with the evidence that did not support reasons to deny LTD benefits to Mr. Rogers.

As explained below, Unum's decision was not reasonable under the known facts before Unum. In practical application, the First Circuit best constructed the analysis for evaluating an

ERISA fiduciary's decision asking: "To what extent has [United] conducted itself as a true fiduciary attempting to fairly decide a claim, letting the chips fall as they may?" *Lavery v. Restoration Hardware Long Term Disability Benefits Plan*, 937 F.3d 71, 79 (1st Cir. 2019). The answer here is not at all. For these summary reasons, the court should deny Unum's motion for summary judgment and instead grant Mr. Rogers' motion, awarding him retroactive benefits to the first date of eligibility.

**I. The court could find the standard of review is deferential.**

The Unum insurance policy has language under which the court may find that Unum's decision is subject to deferential review. The deferential standard of review is forgiving but is "not a rubber stamp." *Wallace v. Johnson & Johnson,* 585 F.3d 11, 15 (1st Cir. 2009). The standard "asks whether" an ERISA fiduciary's "determination is plausible in light of the record as a whole…" *Colby v. Union Sec. Ins. Co. & Mgmt. Co. for Merrimack Anesthesia Assocs. Long Term Disability Plan*, 705 F.3d 58, 61 (1st Cir. 2013) (cleaned up). The decision may only be upheld if the decision "is reasoned and supported by substantial evidence." *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 213 (1st Cir. 2004). Here, Unum's decision was not reasonable based on the record as a whole because Unum's adverse-benefit determination was "arbitrary, capricious or an abuse of discretion." *Tracia v. Liberty Life Assurance Co. of Bos.*, 164 F. Supp. 3d 201, 219 (D. Mass. 2016).

An ERISA fiduciary abuses its discretion when it does not consider medical limitations against actual occupational duties. *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 379–82 (1st Cir. 2015) Unum did not explain its theory how Mr. Rogers could accomplish each of the material duties of his occupation against his documented restrictions and limitations. The law requires this analysis. "A reasoned decision must consider **both** the physical and the cognitive

demands of the occupation." *Winters v. Liberty Life Assurance Co. of Bos.*, 2022 WL 6170588, at *12 (D. Mass. Oct. 7, 2022). (emphasis added) "[P]assing references" to Mr. Roger's own occupation focusing on "light duty" that "were unaccompanied by any attempt to articulate the material duties of" Mr. Roger's "own occupation as "normally performed in the national economy" show that Unum's decision was unreasonable. *McDonough v. Aetna Life Ins. Co.*, 783 F.3d 374, 380 (1st Cir. 2015). Also, the absence of discussion of the cognitive demands of his occupation in a substantive way also shows Unum's adverse-benefit determination was unreasonable. *Id*. Mr. Rogers and his treating doctors reported that he suffered from brain fog and overwhelming fatigue. Having failed to meaningful measure Mr Roger's cognitive limitations against his occupational duties, Unum's determination does not "pass muster under our deferential review," because Unum's decision is not consistent "with the quantity and quality of the evidence in the record" explaining why Mr. Rogers is unable to work in any occupation. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 381 (6th Cir.2005). For these reasons, Unum's decision cannot stand.

Under deferential review, Unum's arguments are cabined by what it discussed in the final adverse-benefit determination letter dated. May 31, 2022. (IX, pp. 3947-3951). *See Petrone*, 935 F. Supp. 2d at 293. (holding fiduciary abused its discretion because the "Final Determination letter fail[ed] meaningfully to address" four physician reports, a functional capacity evaluation and the Social Security Administration finding). "Post-commencement-of-litigation determinations under the aegis of attorneys are not benefit eligibility analyses by a plan administrator to which a court must defer." *Gritzer v. CBS, Inc. et al.*, 275 F.3d 291, 296 (3rd Cir. 2002). Courts have consistently rejected attempts to raise new reasons for denial once litigation has begun. *See Glista v. Unum Life Ins. Co. of Am.,* 378 F.3d 113, 130 (1st Cir. 2004)

("Unum violated ERISA and its regulations by relying on a reason in court that had not been articulated to the claimant during its internal review."). By discussion of each of Unum's adverse-benefit determinations this is not a concession allowing Unum to raise new arguments not made in the May 31, 2022, adverse-benefit determination letter.

**II. Unum granted 26 weeks of STD benefits which ended on August 20, 2020.**

On February 12, 2018, Mr. Rogers began working as Senior Scientist at MKS Instruments, Inc. ("MKS") and became a participant in the MKS STD benefit plan and MKS Instruments, Inc. Plan on March 1, 2018. (II, p. 5; I, p. 36). By February 2020, his based pay was over $100,000 per annum. (II, p. 5; III, p. 646).

For many years, Mr. Rogers suffered from many serious medical ailments. When he left work on February 13, 2020, he had been diagnosed and was being treat for mixed connective tissue disease; irritable bowel syndrome – both constipation and diarrhea; intractable cluster headache; chronic left shoulder pain; systemic lupus erythematosus; poly-myositis; rheumatoid arthritis; anxiety; immunosuppressed state due to medication. (IX, p. 3727). The most pronounced and debilitating disease is mixed connective tissue disease. ((II, p. 880; III, p. 553). However, the conglomeration of diseases and symptoms, and side-effects from medications, caused Mr. Rogers to suffer from chronic pain, fatigue and limited mobility depending on the day. (III, p. 849; VII, p. 2682; 3694). Mr. Rogers reported that he suffered from brain fog. (VII, p. 2681; 83; 91; 95). *See Diaz v. Prudential Ins. Co. of America*, 499 F.3d 640, 646 (7th Cir.2007) (claimant's pursuit of extensive treatment including heavy medication and repeated surgical procedures "supports an inference that his pain, though hard to explain by reference to physical symptoms, was disabling"). His rheumatologist found Mr. Rogers' reports credible. (II, p. 880; VII, p. 2680)

In addition, Mr. Rogers had undergone shoulder surgery about six months before that had not been successful in relieving chronic pain. (III, p. 698; 866). He was advised that he would need a shoulder replacement in the future. (IV, p. 1056). In February 2020, he was only 39 years old. (II, p. 4).

Unum administered the STD plan that MKS provided to Mr. Rogers and other employees. (II, p. 2). 54. During the 26-week short-term disability time, Noreen Ferrante, MD, a rheumatologist and John Chisholm, DO, an internist, provided medical records and responded to inquiries from Unum, and based on their information, Unum granted benefits to Mr. Rogers. (VIII, p. 3354). By letter dated March 26, 2020, Unum promptly approved Mr. Rogers' claim for short-term disability benefits. (VIII, p. 3347). Two months later, Unum reapproved his STD benefits. (VIII, p. 3350). Two months later, Unum reapproved his STD benefits. (VIII, p. 3352). On August 25, 2020, Unum wrote, "Your claim has been approved for the maximum duration of your employer's 26 week policy. …Your claim is approaching a point where Short Term Disability benefits will end and you claim will be considered for benefits under the Long Term Disability Plan. (VIII, p. 3354). Other Unum claim notes reflected that Mr Rogers received the maximum benefits available under the short-term disability plan administered by Unum. Unum internal note stated, "Please set up new LTD as STD maxed on 8/20." (II, p. 35).

**III. Unum required Mr. Rogers to promptly file for SSDI Benefits.**

On October 24, 2020, Unum required Mr. Rogers to sign a Social Security reimbursement agreement for the benefit of Unum. (III, p. 816). If Mr. Rogers did sign the reimbursement form, Unum represented that he would estimate his Social Security Income Disability benefits and reduce his LTD benefits:(III, p. 816).

> plan. I fully understand that by paying me an unreduced benefit at this time, an overpayment will likely be incurred on my disability claim that I will have to repay in the future. This request is made with the understanding that I also have the option of requesting that Unum estimate amounts from other sources when calculating my benefits. Estimation will occur if I make a specific request to Unum, or if I fail to sign this form.

Mr. Rogers applied for disability benefits with the Social Security Administration. ("SSA"). On October 12, 2021, the SSA determined that Mr. Rogers was eligible for benefits and that his disability began on February 24, 2020, about a week after he left work at MKS. (IX, p. 3731). The Social Security Administration determined: (IX, p. 3731).

**DETERMINATION PURSUANT TO THE SOCIAL SECURITY ACT, AS AMENDED**

15. CLAIMANT DISABLED
A. [X] Disability Began 02/14/2020
B. [ ] Disability Ceased

16A. PRIMARY DIAGNOSIS: Osteoarthrosis and Allied Disorders — BODY SYS. 01 — CODE NO. 7150

16B. SECONDARY DIAGNOSIS: Disorders of Muscle, Ligament and Fascia — CODE NO. 7280

17. DIARY TYPE: MRN — MO./YR.: 09/2024 — REASON: 3

18. CASE OF BLINDNESS AS DEFINED IN SEC. 1614(a)(2)/(216)(i)
A. [ ] Not Disab. for Cash Bene. Purp. B. [ ] Disab. for Cash Benefit Purp. Beg.

19. CLAIMANT NOT DISABLED
A. [ ] Through Date of Current Determination B. [ ] Through ________ C. [ ] Before Age 22 (CDB only)

20. VOCATIONAL BACKGROUND — OCC YRS. — ED YRS. 16

21. VR ACTION — SC IN A. [ ] — SC OUT B. [ ] — Prev Ref C. [ ]

22. REG-BASIS CODE: A1 — 23. MED LIST NO.: 014.09D — 24. MOB CODE — 25. REVISED DET [ ] — 25A. Initial A. [X] — Recon B. [ ] — Recon DHU C. [ ] — ALJ Hearing D. [ ] — Appeals Council E. [ ] — U.S. District Court F. [ ]

26. LIST NO. A. ______ B. ______ C. ______ D. ______ E. ______ F. ______

27. RATIONALE [ ] See Attached SSA 4268 [ ] Vocational Rule Met ______

28. A. [X] Period of Disability B. [ ] Disability Period C. [X] Estab Beg ______ AND D. [ ] Continues E. [ ] Term ______

29. LTR/PAR NO.

30. DISABILITY EXAMINER-DDS: Dewana Wilson — 31. DATE: 10/20/2021

32. PHYSICIAN OR MEDICAL SPEC. SIGNATURE: 416A1 in DDE 10/12/2021 — 33. DATE: 10/12/2021

32A. PHYSICIAN OR MEDICAL SPEC. NAME *(Stamp, Print or Type)*: Virginia Byrnes — 32B. SPEC. CODE: 19

The SSA records included detailed information in a Function Report that contained detailed information on Mr. Rogers' limitations. (IX, pp. 3614-3621). Unum knew: (IX, p. 3738).

> **After receiving and reviewing the claimant's medical examination records, the SSA concluded that the claimant's medical impairment was of such severity that it Met the criteria of Medical Listing 14.09D. The SSA documented the following statements in support of their conclusion.**
>
> **"Meets 14.09D."**

Unum understood that 14.09D meant: (IX, p. 3738).

> 14.09 Inflammatory arthritis. As described in 14.00D6. With:
>
> D. Repeated manifestations of inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level:
>
> 1. Limitation of activities of daily living.
> 2. Limitation in maintaining social functioning.
> 3. Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

Unum knew that: (IX, p. 3738).

> The SSA 831, Disability Determination and Transmittal form documents an approved DOD of 2/14/2020. The primary approved diagnosis is listed as Osteoarthrosis and Allied Disorders (code 7150). The secondary approved diagnosis is listed as Disorders of Muscle, Ligament and Fascia (code 7280).

Mr. Rogers tendered a copy of his entire SSA file to Unum, so Unum had access to all of the documents SSA reviewed too. (IX, p. 3738).

## IV. Unum administered FMLA leave for MKS and determined he was unable to return to work even with accommodations.

Unum maintained a separate claim number for Unum's administration of FMLA leave and Americans with Disabilities Act coverage. (VIII, p. 3275-76). Unum determined throughout the LTD benefits administration and as late as July 21, 2022, that Mr. Rogers would be on indefinite leave and MKS could not accommodate him at work. For example, on July 21, 2022, Unum wrote: (VIII, p. 3275).

> The purpose of leave as an accommodation is to allow an employee to recover and return to work. According to the EEOC, indefinite leave - meaning that an employee cannot say whether or when they will be able to return to work at all - will constitute an undue hardship and so does not have to be provided as a reasonable accommodation. At this time, neither you nor your physician(s) have been able to provide any certainty around your ability to return to work.
>
> Your provider confirmed on June 24, 2021 that they were unable to provide any certainty around when you may return to work or whether you will be capable of returning to work.
>
> Based on the documentation provided the medical provider, and our own legal review, we have determined that your need for leave has become indefinite. Therefore, Unum has proceeded to place your ADA file in an inactive status.

Unum had concluded based on information provided by Mr. Rogers' doctors and its "own legal review" that Mr. Rogers "need for leave ha[d] become indefinite. (VIII, p. 3275).

**V. Unum denied LTD benefits on December 22, 2020.**

Unum transferred the STD benefits file to the LTD unit. (VII, p. 2509). By letter dated August 25, 2020, Unum advised Mr. Rogers to secure LTD benefits under the Policy; Unum represented he needed to provide from his attending physicians: (VIII, p. 3355).

- Medical records (including treatment records, procedure records, physical therapy records and test results) from all treating providers from July 15, 2020 forward.
- Restrictions and limitations (a list of things you should not and cannot do).

On October 23, 2020, Unum requested medical records from Mr. Rogers' internist, Dr. Chisholm and his rheumatologist, Dr. Ferrante, and their determinations regarding their assessment of restrictions and limitations. (III, p. 801).

**A. Dr. Ferrante determined that Mr. Rogers remained totally disabled.**

On August 21, 2020, Dr. Ferrante documented in her medical records: (II, p. 880)

Mixed connective tissue disease: Increased disease activity since his last visit (February 2
He now has objective inflammation of the L knee and L ankle. Fatigue is severe and debilitating. Difficulties with memory and concentration are more prominent. C3 & C4 complements remain low, indicating ongoing active autoimmune disease. He remains on disability from his job, and I feel this is appropriate because he certainly does not have the physical stamina to work even in a sedentary job, and concentration and memory are a problem.
We had a long discussion about his concerns related to COVID. I explained he is definite increased risk because of taking an immunosuppressive medication, and I am equally concerned that the infection could cause a flare of his underlying medical condition, and whether he would be more likely to have autoimmune complications of the infection since has an underlying autoimmune disease. He is isolating at home, but there is a very real concern that his children could be a source of exposure if they attend school and person. While there are certainly benefits for the children attending school in person, there is no question that having him attend school remotely would be safer for the patient.
I feel he needs an NSAID to manage the joint pain and swelling, but he has had problems tolerating ibuprofen and naproxen in the past, and Celebrex is not an option because he is sulfa allergic. I have prescribed nabumetone 750 mg twice daily.
He will continue mycophenolate and hydroxychloroquine at the current doses.
follow-up visit in approximately 1 month
Labs (CBC, C3 & C4 complements) a couple of days prior to the visit

Diagnoses and all orders for this visit:

**MCTD (mixed connective tissue disease)**
- BASIC HEMOGRAM WITH DIFFERENTIAL; Future
- C3 COMPLEMENT; Future
- C4 COMPLEMENT; Future

**IMMUNOSUPPRESSED STATE DUE TO MEDICATION**
- BASIC HEMOGRAM WITH DIFFERENTIAL; Future
- C3 COMPLEMENT; Future
- C4 COMPLEMENT; Future

**Leukopenia, unspecified type**
- BASIC HEMOGRAM WITH DIFFERENTIAL; Future
- C3 COMPLEMENT; Future
- C4 COMPLEMENT; Future

On October 13, 2020, Dr. Ferrante documented in her medical records: (II, p. 996).

**ASSESSMENT / PLAN / DISCUSSION WITH PATIENT:**
Mixed Connective Tissue Disease (MCTD): Profound fatigue is his most limiting symptom at this time but he is also troubled by joint pain and swelling, Raynaud's phenomenon, problems with concentration and word-finding difficulty. C3 & C4 complements remain low, and have decreased since they were last tested in July, indicating an increase in autoimmune disease activity. He remains on disability from his job, and I feel this is appropriate because he does not have the physical stamina to work even in a sedentary job, and concentration and memory are a problem.

Diagnoses for this visit:

**Mixed connective tissue disease**
- methotrexate 2.5 mg tablet; 4 tablets once weekly Dispense: 16 tablet; Refill: 3
- folic acid 1 mg tablet; Take 1 tablet by mouth daily Dispense: 30 tablet; Refill: 11
- hydroxychloroquine (PLAQUENIL) 200 mg tablet; Take one tablet on odd days of the month and 2 tablets on even days of the month Dispense: 45 tablet; Refill: 5
- ECHOCARDIOGRAM W/DOPPLER AND COLOR FLOW, COMPLETE; Future

**Discoid lupus**
- hydroxychloroquine (PLAQUENIL) 200 mg tablet; Take one tablet on odd days of the month and 2 tablets on even days of the month Dispense: 45 tablet; Refill: 5

**Dyspnea on exertion**
- ECHOCARDIOGRAM W/DOPPLER AND COLOR FLOW, COMPLETE; Future

On November 30, 2020, Unum's employee, Dr. Kirsch offered an opinion, without examining Mr. Rogers, that he could work in his prior occupation: (IV, p. 1203).

It is my opinion, after review of the medical records that are available to me; it appears reasonable Robert Mace Rogers had the functional capacity to perform the physical and cognitive demands as listed above on a full-time, sustained basis, as of February 14, 2020 and ongoing.

Dr. Kirsch asked Dr. Ferrante to agree with him, and Dr. Ferrante responded that she disagreed with Dr. Kirsch's conclusion: (IV, p. 1203).

Do you agree?

Yes ______________ No ✓

(if no, please provide clinical rationale and physical findings to support your opinion)

Updated labs included
Patient had telehealth visit on 10/13/20

On December 3, 2020, an Unum ADA specialist wrote to Dr. Ferrante. (IV, p. 1220). On December 10, 2020, Dr. Ferrante responded and advised Unum: (IV, pp. 1220-22).

Based on your patient's current medical condition, please provide the information requested below, answering the questions as completely as possible.

- What are the patient's current restrictions (what the patient should not do) and limitations (what the patient cannot do)? Please be specific and note that a reply of "no work" or "totally incapacitated" is not sufficient.

No lifting > 5lbs, no walking, or standing > 5mins
No continuous sitting > 20mins, no bending reaching
squatting, occasional Keyboarding

- Please explain why these restrictions are medically necessary.

Patient does not have physical stamina to
work in a sedentary job, and concentration
and memory are a problem

**B. Dr. Chisolm determined that Mr. Rogers remained totally disabled.**

Dr. Chisholm had been caring for Mr. Rogers since November 29, 2017. (III, p. 512). On March 25, 2020, Dr. Chisholm advised Unum regarding Mr. Roger's restrictions and limitations including: "no lifting ≥ 5#; no walking ≥ 5; no standing ≥ 5 min; no sitting ≥ 20 min; occasional keyboarding." (II, p. 132). 68. When asked by Unum's physicians if Mr. Rogers could work, Dr Chisholm repeatedly advised Unum the answer in the negative. (IV, p. 1239). On November 30, 2020, Unum's Dr. Kirsch offered an opinion, without examining Mr. Rogers, that he could work in his prior occupation just as he had in the letter to Dr. Ferrante. (IV, p. 1239). Dr. Kirsch asked Dr. Chisholm to agree with him, and Dr. Chisholm responded that he disagreed with Dr. Kirsch's

conclusion: (IV, p. 1239)

Do you agree?
Yes ✓ No ✓
(if no, please provide clinical rationale and physical findings to support your opinion)

His symptoms of mixed connective tissue disease can wax/wane and can be very limiting. I don't agree with treatment intensity not c/w impairing condition. It is a rheum disease and appropriately treated by rheumatology

(John Chisholm, D.O.) Signature 12/10/20 Date

I'm ok with functional testing, however, there are without question times that will be different than testing results.

### C. Unum hired a vendor to surveil Mr. Rogers on November 18-19, 2020.

On November 18-19, 2020, Unum hired G4S to spy on Mr. Rogers (IV, p. 1156). G4S watched Mr. Rogers for days and noted that he barely left his home. (IV, p. 1160-1163). The surveillance showed how inactive Mr. Rogers had become due to his illnesses.

### D. Unum's file notes documented Mr. Rogers illnesses.

On November 10, 2020, a team of Unum employees reviewed Dr. Rogers' medical condition to determine if he could work with the following claim overview: (IV, p. 1055).

**Claim Overview** EE is a 39 yo male Senior Scientist dx with Other overlap syndromes. APS noted dx of Mixed Connective Tissue Disease (MCTD) and Inflammatory Myopathy. APS noted EE was first treated on 12/22/2017. APS noted RLs of 'No lifting more than 5 lbs., no walking or standing more than 5 minutes, no sitting more than 20 minutes, no bending, reaching, squatting, occasional fingering (keyboarding), 2/14/20 - 4/14/20. APQ dated 3/25/20 advised RLs of 'No lifting more than 5 lbs., no walking more than 5 minutes, no standing more than 5 minutes, no sitting more than 20 minutes, and occasional keyboarding' 2/20/20 - 5/20/20. RLs and MRs rec'd from AP-Chisholm dated through 8/21/20 (includes some MRs from AP-Ferrante) RLs and MRs rec'd from AP-Ferrante dated through 10/21/20 MRs requested from Atrius Health in Norwood and Wellesley

The Unum employees documented the many diseases afflicting Mr. Rogers: (IV, p. 1056).

> MEDICAL: IL OOW 2/14/20 with EP 8/20/20 with prior forum needing all treatment records through EP. 8/21/20 OV Ferrante, rheumatologist: eval for severe fatigue and joint pain. PE: notes erythema on cheeks, L knee/ankle swelling; difficulty coming up with words or remembering what he was going to say during the course of the visit. Labs abnormal for low WBC, C4 complement and C3 complement-provider notes indicative of active autoimmune disease. Dx: MCTD (mixed connective tissue disease), immunosuppressed state d/t meds, leukopenia (low white blood cell count) and joint swelling. Does not have physical stamina to work even in a sedentary job. PCP is oping no work during a flare; when not having a flare could do all job tasks. EE's reports regarding no use of L arm and lung issues are not consistent with medical to date. To date, rheumatologist Ferrante has not responded to GPN. This as well as additional information below would be helpful in assessing functional loss from DOD through EP.

## E. Unum relied on non-examining doctors who were Unum employees or consultants who all disagreed with Drs. Ferrante's and Dr. Chisholm's determinations.

### 1. Dr. Jain.

Unum relied on four file reviewing doctors to deny Mr. Rogers LTD benefits claim. Not one was licensed to practice in the Commonwealth of Massachusetts. Their opinions do not square with the first-hand medical observations and treatments by Drs. Ferrante and Chisholm. Nor can they be reconciled against the fact that Unum granted STD benefits during the same period that some of these doctors argued he was fully able to work in his occupation.

First, Unum turned to Dr. Prerna Jain. She appears not to be licensed to practice medicine in the United States and is likely an OBGYN in India. (IV, pp. 1100-66). https://book-appointment.healthplix.com/dr-prerna-jain-obstetrician--gynecologist-and-infertility-specialist-new-palasia-indore (last viewed July 12, 2023). Unum's internal file notes list pages of medical summaries. (IV, pp. 1100-05). Then, Dr. Jain simply concludes: (IV, p. 1105.

> Conclusion: Based on the medical information in the file, it is unclear if EE is precluded from performing within light level functional demands from DOD 2/14/20 - EP End Date 8/20/20 and beyond based on the following:

She noted reports of pain and fatigue and discounts it because Mr. Rogers "has not had updated lab work. (IV, p. 1105). She does not say what lab work would disclose and she takes no consideration of COVID-19 lockdown. She acknowledged "pain in left shoulder, fatigue, brain fog, and confusion joint swelling" and mores she claimed that Mr. Rogers was very active but points to no evidence of current activities. (IV, p. 1106). She made the unwarranted conclusion that Mr. Rogers was running a consultant business. (IC, p. 1106). She acknowledges "left shoulder degenerative disease, chronic cluster headaches" and more but offers no comments about each. (IV, p. 1106). Without any reasonable explanation for rejecting the determinations of Drs. Chisholm and Ferrante nor explaining, she concludes, "Based on the medical information in the file it is unclear if [Mr. Rogers] is precluded from performing within the light level functional demands from [date of disability] 2/14/2020…8/20/20 and beyond. (IV, p. 1106). It appears that she was not told, or she ignored, that during the same time period Mr. Rogers received STD benefits administered by Unum.

**2. Stephen J. Kirsch, MD.**

Second, Unum turned to Dr. Kirsch who tried to convince Dr. Chisholm and Dr. Ferrante to agree with his conclusions by sending simple letters, surely hoping each would sign without question. Dr. Kirsch argued that because Mr. Rogers did not have additional lab work or intensity of treatment, which meant that Mr. Rogers was no longer impaired. (IV, p. 1205). Dr. Ferrante disagreed. (IV, p. 1205). So did Dr. Chisholm. (IV, p. 1239).

Dr. Kirsch had no explanation for the documented impairments Drs. Ferrante and Chisholm maintained in their medical records. Dr. Kirsch did not explain what lab results would show. He did not take into consideration the COVID-19 emergency that limited access to medical care.

Recently a court remarked that Dr. Kirsch pitched arguments under "headings are either unconvincing or are, at best, of peripheral importance." *Snapper v. Unum Life Ins. Co. of Am.*, — F.Supp.3d—, 2023 WL 2539242, at *32 (N.D. Ill. Mar. 16, 2023). The same can be said of Dr. Kirsch's analysis regarding Mr. Rogers.

**3. Donna Kim, MD**

Third, Unum turned to Dr. Kim. Unum specifically asked her to opine if "the medical evidence supports that Mr. Rogers is precluded from performing the full-time light occupational demands list below from 2/14/20" and "through 8/20/20…and beyond." (IV, p. 1232). Just like Dr. Prerna, Dr. Kim lists many medical conditions afflicting Mr. Rogers. (IV, pp. 1232-35). Much of Dr. Kim's commentary is often verbatim what Dr. Prerna wrote, suggesting a "cut and paste." Dr. Kim offered no credible explanation why her opinion is accurate, and Drs. Chisholm's and Ferrante's were wrong.

**4. Arlen Green, MD**

Fourth, Unum turned to California based Dr. Green. Dr. Green's three-page opinion consists mostly of medical summary. His opinion is in one paragraph near the end. (IV, pp. 1247-48). He merely agreed with the other Unum doctors and offered no explanation why the determinations of Drs. Chisholm and Green were wrong. The limited analysis is of no persuasive value. *See Kalish v. Liberty Mut./Liberty Life Assur. Co. of Bos.*, 419 F.3d 501, 509 (6th Cir. 2005) (concluding that a six page medical summary and one page of analysis was nothing more than simply saying "'the available records do not document a need for restrictions or limitations that would necessarily preclude the employee from performing the duties of his job as described.'"). This holds true for the opinions of Drs. Prerna, Kirsch and Kim too.

Unum's file reviewers gave barely any consideration to Mr. Roger's cognitive work demands. This is a ground to place little credence in their opinions. *See Brown v. UNUM Life Ins. Co. of Am.*, 356 F. Supp. 3d 949, 966 (C.D. Cal. 2019) ("Unum's physician consultants ... did not discuss Plaintiff's ability to satisfy the non-physical demands of her usual occupation; instead, they focused on the minimal physical demands, finding that Plaintiff could meet those demands."). In this case Mr. Rogers could not even do the physical tasks of his occupation. But "[a] reasoned decision must consider **both** the physical and the cognitive demands of the occupation." *Winters v. Liberty Life Assurance Co. of Bos.*, 2022 WL 6170588, at *12 (D. Mass. Oct. 7, 2022). (emphasis added). Unum's doctors failed to make this dual assessment.

**F. Unum wrongly called Mr. Rogers as chemist.**

Unum classified Mr. Roger's occupation as a chemist which it later admitted was wrong. (VIII, pp. 3104-3106). In a second appeal, Mr. Rogers had to hire a vocational specialist to explain why Unum was wrong in its occupational classification. The detailed report by Rhoda Jellinek is discussed more below. (IX, pp. 3873-96).

**VI. Unum violated the Regulatory Settlement Agreement and its claims manual when it denied benefits on December 22, 2020.**

Against the overbearing weight of medical evidence favoring an award of LTD benefits to Mr. Rogers, Unum denied his claim. By letter dated December 22, 2020, despite no change in his medical condition or symptoms since Unum had approved short-term disability benefits through late August 2020, Unum denied LTD benefits to Mr. Rogers. (IV, 1255).

While a treating physician is not due any special deference in the ERISA context, Mr. Rogers' reliable evidence by treating providers must still be credited. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825, 834 (2003). Despite the Supreme Court's *Nord* decision,

Unum agreed to defer to treating physician opinions under the regulatory settlement agreement ("RSA") it made with insurance regulators in Massachusetts and the US Department of Labor and eventually all 50 states. (Doc No. 8, pp. 56-57 of 295). Unum "incorporated changes to its claims handling procedures pursuant to the RSA in 2008, and those changes are reflected in the claims manual." *Dwyer v. Unum Life Ins. Co. of Am*., 548 F.Supp.3d 468, 472 (E.D. Pa. July 8, 2021). Part of the manual and the RSA requires Unum "giving significant weight to an attending physician's ('AP') opinion, if the AP is properly licensed and the claimed medical condition falls within the AP's customary area of practice." (Doc No. 8, pp. 290-91 of 295). Unum may only reject the "AP's opinion" when "the claim file…include[s] specific reasons why the opinion is not well supported by medically acceptable clinical or diagnostic standards **and** is inconsistent with other substantial evidence in the record." *Id*. at 473 (emphasis added). In summary, Unum agreed to provide greater protection to ERISA plan participants than had been previously required under ERISA common law, now memorialized as the two-prong test in the RSA.

Here, Unum never addressed the second prong, so that is addressed first. Then, Unum's failure to address the first prong follows.

**1. Unum did not identify other substantial evidence in the record which justified rejecting the treating physicians' determinations.**

Turning to the second prong of the RSA test, Unum did not document in the claim file other "substantial evidence in the record" justifying its rejection of Drs. Chisholm's and Ferrante's conclusions. For example, if the surveillance conducted on November 18-19, 2020, by G4S to spy found Mr. Rogers running a marathon, engaging in a weightlifting competition or anything inconsistent with the medical records, then Unum would have met this prong. (IV, p.

1156). In this case, Unum could not point to any credible evidence undermining the treating physician determinations.

2. **Unum failed to provide specific reasons why the opinion of Drs. Chisholm and Ferrante were wrong or outside their area of practice.**

As to the first prong, Unum offered no opinion why Drs. Chisholm and Ferrante's opinion provided support for Mr. Rogers to receive 26 weeks of STD benefits were now wrong. When discrediting the opinions of Mr. Roger's treating healthcare providers, whose opinions are supported by so much evidence, the non-examining Unum doctors had to provide a "compelling explanation for this stark inconsistency with all of the other evidence of record. *Petrone v. Long Term Disability Income Plan for Choices Eligible Emps. of Johnson & Johnson & Affiliated Companies*, 935 F. Supp. 2d 278, 294 (D. Mass. 2013).

In summary, Unum violated the RSA and its claims manual when it refused to pay LTD benefits when it suddenly changed course without reasonable explanation. Both violations were not trivial but benefit outcome determinative and unlawful. *See Roehr v. Sun Life Assurance Co. of Canada*, 21 F.4th 519, 526 (8th Cir. 2021) () ("a plan administrator's reliance on the same evidence to both find a disability and later discredit that disability does not amount to a reliance on 'substantial evidence'").

**VII. Unum assisted in the unlicensed practice of medicine.**

Unum relied on at least four doctors who were not licensed to practice medicine in the Commonwealth and offered disability opinions about Mr. Rogers. The Massachusetts Legislature gave the Massachusetts Board of Registration in Medicine ("Board") authority to define the practice of medicine in Massachusetts to protect residents of the Commonwealth. The Board

requires that physicians evaluating the disability of a Massachusetts resident hold a Full License to Practice Medicine in Massachusetts. 243 CMR 2.01. (VIII, p. 3060-62).

Unum has argued in other cases that this regulation does not apply to ERISA-governed claims. *First*, ERISA does not pre-empt state regulations. ERISA preemption does not reach "traditionally state-regulated substantive law in those areas where ERISA has nothing to say." *Cal. Div. of Labor Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 330 (1997).

*Second*, Massachusetts may control the practice of medicine within its borders affecting Massachusetts residents. Enacting a regulation that protects its residents from out-of-state medical doctors is well within the police powers of Massachusetts. ERISA's preemption provision, 29 U.S.C. 1144(a), provides that the statute "shall supersede any and all State laws insofar as they * * * relate to any employee benefit plan" covered by the statute. The Supreme Court has long held that "[a] law 'relates to' an employee benefit plan, in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96-97 (1983) (footnote omitted). When looking at a state law concerning typical governance over state matters, "[W]e must remain mindful that ERISA was not intended to supersede the state's historic police powers unless such supersession "was the clear and manifest purpose of Congress." *Merit Const. Alliance v. City of Quincy*, 759 F.3d 122, 128 (1st Cir. 2014) (citing *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)) (internal quotation mark omitted). More than 25 years ago, the Supreme Court noted "that the historic police powers of the State include the regulation of matters of health and safety." *De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997). The Supreme Court continued, "A consideration of the actual operation of the state statute leads us to the conclusion that the HFA is one of 'myriad state laws' of general applicability that impose

some burdens on the administration of ERISA plans but nevertheless do not 'relate to' them within the meaning of the governing statute." *Id*. at 815. ERISA thus should not be held to preempt state laws in the historically state-regulated field of health care "unless that was the clear and manifest purpose of Congress." *Travelers*, 514 U.S. at 655; *accord De Buono*, 520 U.S. at 81.

Unum may argue that a Department of Labor Advisory Opinion, 2005-16A gives permission to use doctors licensed in a state other than where an ERISA plan beneficiary lives. An advisory opinion cannot override a Massachusetts regulation. This opinion does not concern a disability benefits claim. The response was to a health benefits claim. (https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/advisory-opinions/2005-16a) ("Your inquiry concerned the requirement in 29 C.F.R. § 2560.503-1(h)(3)(iii) that a named fiduciary deciding an appeal of a "health benefits claim" that was denied, in whole or in part, based on medical judgment must consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment).

## VIII. Mr. Rogers appeals Unum's adverse-benefit determination.

> On May 8, 2021, Mr. Rogers appealed by letter to Unum and delivered the following information consisting of 426 pages (labeled in the right lower corner (x of 426) of documents:
>
> A. Dr. Ferrante FMLA support dated March 4, 2021 describing restrictions and limitations preventing Mr. Rogers from working in his occupation. B. Medical records including allergies, immunizations, medications, preventive. care, test results, summaries and additional medical information. C. Sworn Statement Michael Daly. D. Sworn Statement Christina Neusch. E. Sworn Statement Robert Rogers. F. Sworn Statement Braxton Sisco. G. Sworn Statement Teresa Rogers. H. Patient Personal Assessment. I. Patient Personal Assessment with concurrent by Noreen Ferrante, MD, board certified in internal medicine with subspecialty in Rheumatology. J. Noreen Ferrante, MD summary bio. K. Photos depicting blepharitis. L. Photos depicting swollen hands. M. Photos

depicting swollen knee. N. Photos depicting symptoms of Reynaud's Syndrome on fingers and hands. O. Photos depicting rash on lower arm near wrist.
P. Photo depicting plasma generator and data sheets disclosing 54 pounds and 81 Pounds Q. Smashed plasma tube showing shards of glass covered with hazard toxic residue. R. Film showing tremors in hand and arm. S. Healthcare provider chart.
T. Prescription List. U. Details occupational description, including company job description, hour by hour description of typical work-day. V. MKS job description.
W. Robert M. Rogers CV (Resume). X. Board of Registration in Medicine Opinion.
Y. Transcripts showing that MR. Rogers only took a single chemistry class and is not a chemist by occupation. (VII, p. 2594-95).

**A. Unum never considered the sworn declarations.**

Mr. Rogers provided in support of his appeal, including those of: Braxton Sisco, Teresa Rogers, Christina Neusch, Michael Daly and Mr. Rogers[2]. (VII, pp. 2743-48; 2751-53; 2754-55; 2763; 2865-2870). There is no discussion of these first-hand observations. The sworn statements are akin to direct testimony in an ERISA welfare-benefits case. Nothing is mentioned by Unum in its adverse-benefit determination letters dated August 18, 2021, and May 31, 2022. (VIII, p. 3279; IX, pp. 3947-3951). Mr. Rogers explained in great detail in his sworn statement and in his personal assessment, how his illnesses prevented him from working. He described symptoms such as brain fog. (VII, p. 2681; 83; 91; 95). His spouse, Braxton Sisco described the assistance he needed to provide to Mr. Rogers. (VII, pp. 2743-48). In order to provide full and fair review under ERISA, Unum had an obligation to consider this sworn testimony.

**B. Mr. Rogers' physicians supported his claim for benefits.**

On March 17, 2021, Dr. Ferrante signed a concurrence stating that Mr. Rogers' description of his symptoms was accurate and that he was not overstating anything. (VII, p.

[2] The dates of 2020 on both Mr. Sisco's and Mr. Rogers' declarations are typos and should read 2021 given the date submitted to Unum.

2680). This was tied to Mr. Rogers' lengthy assessment of his specific limitations. (VII, p. 2681-99). He provided updated medical record.

**C. The examination by Dr. Rapoport did not support Unum's arguments.**

Unum sent Mr. Rogers for an exam with Dr. Rapoport. Dr. Rapoport's examination lasted about 45 minutes. (VIII, pp. 3176-82). Yet his report hardly supported Unum's conclusions. Unum downplayed the exam report, because Dr. Rapoport concluded that Mr. Rogers could do physical tasks of "full-time, light work activity if his fatigue does not intervene excessively. (VIII, p. 3168). (emphasis added). Even if Mr. Roger's occupation was only "light-duty" as Unum argued, Dr. Rapoport did not conclude that Mr. Rogers could work regularly.

**D. Mr. Rogers delivered his entire SSA file to Unum for consideration.**

After receiving a benefit award in October 2021, Mr. Rogers tendered a copy of his entire SSA file to Unum, so Unum had access to all of the documents SSA reviewed too. (IX, p. 3738). This triggered Unum to further review Dr. Roger's appeal. Unum downplayed the award and tried to distinguish it on frivolous grounds. The results are discussed above in III. Of particular significance is that the SSA found Mr. Rogers' occupationally impaired on application, not after an appeal or appearing before an ALJ. The medical evidence was overwhelming.

1. **To try to distance itself from the SSA award Unum turned to Dr. Scott Norris another Unum employee unlicensed in Massachusetts to practice medicine.**

Dr. Norris has a documented history of disregarding evidence, yet he is willing to opine on a wide-ranging list of illnesses, when necessary to support adverse-benefit determinations. *See e.g., Carney v. Unum Life Ins. Co. of Am.*, 2022 WL 988360, *8 (E.D. Mich. Mar. 31, 2022)

("[A]t least some of Dr. Norris' conclusions are not borne out by the objective evidence present in the administrative record," also noting Dr. Norris did not examine plaintiff "despite the fact that [the plaintiff's] complaints (pain and its ensuing effects) are highly subjective in nature and amenable to more effective evaluation and understanding when personal communication and observation is possible.") (pain/cervical degenerative disc disease); *Chicco v. First Unum Life Ins. Co.*, 2022 WL 621985, *4 (S.D.N.Y. Mar. 3, 2022) (Dr. Norris did not refute the conclusions of Chicco's treating physicians, and improperly "discounted as not time-relevant physical findings from examinations performed after [the plaintiff] stopped working.") (pain/radiculopathy); *Boykin v Unum Life Ins. Co. of Am.*, 2022 WL 458213, *14 (E.D. Cal. Feb. 15, 2022) ("Dr. Norris' evaluation is entitled to little weight.") (pain/spine injuries); *Boersma v. Unum Life Ins. Co. of Am.*, 546 F. Supp. 3d 703, 710 (M.D. Tenn. 2021) (rejecting Dr. Norris' opinion as conclusory) (fibromyalgia/seronegative rheumatoid arthritis); *Dwyer v. Unum Life Ins. Co. of Am.*, 548 F. Supp. 3d 468, 483-84 (E.D. Pa 2021) (although Dr. Norris testified that he did not doubt the plaintiff's symptoms or the veracity of her treating physician, his report inconsistently discredited plaintiff's reported symptoms) (Meniere's Disease); *Rios v Unum*, 2020 WL 7311343 (C.D. Cal., Dec. 10, 2020) (criticizing Dr. Norris as not being an expert in the field and for failing to personally examine plaintiff) (degenerative lumbar disc disease/stenosis/radiculopathy); *Barnes v. Unum Life Ins. Co. of Am.*, 2020 WL 10221073, *9 (E.D. Tenn. Nov. 24, 2020) (criticizing Dr. Norris for rejecting plaintiff's credible reports of pain severity; and rejecting FCE on the basis it was inconsistent with the evidence when it was not) (herniated disc/osteopenia/complications with cancer treatment/labile blood pressure) (also involving Dr. Haller); *Olis v. Unum Life Ins. Co. of Am.*, 2020 WL 4380948, *12 (C.D.Ca. July 27, 2020) (Dr. Norris "does not appear to have acknowledged" test results) (migraines/vertigo/eye pain/visual

disturbances); *Mistick v. Unum Group, et. al*., 2020 WL 13442144 (E.D.Tenn. March 30, 2020) (finding "Haller, Schnars, and Norris's reports all fail to adequately explain why the medical records they reviewed demonstrate that Mistick is capable of sedentary work…") (ischemic cardiomyopathy/dyspnea/left bundle branch block) (also involving Dr. Haller); *Rikimaru v. Unum Life Ins. Co.of Am.*, 2020 WL 13505360, *8 (D.Col. March 27, 2020) (where information submitted on appeal supported disability, which Dr. Norris and other Unum physicians, dismissed) (vertigo/ head injury/vestibular weakness); *Tam v. First Unum Life Ins. Co.*, 491 F. Supp 3d 698, 707, 711 n.11 (C.D. Cal. 2020) ("Dr. Norris dismissed the CPET Report and Neuropsychological Evaluation as 'not time-relevant.'… However, it is obvious that medical reports are inevitably rendered retrospectively and should not be disregarded solely on that basis.") (chronic fatigue syndrome/ enterovirus infection); *Brown v. Unum Life Ins. Co. of Am.*, 356 F. Supp. 3d 949, 961 (C.D. Cal. 2019) (criticizing faulty foundation for Dr. Norris' opinion) (cancer); *Forman v. First Unum Life Ins. Co*., 469 F.Supp.3d 367, 370 (E.D. PA. 2020) (Dr. Norris concluded the plaintiff was not disabled leading to an evidentiary hearing) (deep vein thrombosis/pulmonary embolism); *Christoff v. Unum Life Ins. Co. of Am.*, 2019 WL 4757884, *5 (D. Minn. Sep. 30, 2019) ("Dr. Norris reache[d] conclusions contradicting those of several of the medical professionals who had previously examined and treated [the plaintiff].") (fibromyalgia) (also involving Dr. Bress); *Dewsnup v. Unum Life Ins. Co. of Am.*, 2018 WL 6478886, *10 (D. Utah Dec. 10, 2018) ("[T]he court gives greater weight to the opinions of his treating physicians, who were better able to assess the veracity of Mr. Dewsnup's reports of pain…[Dr. Norris] would have been well-served to meet with Mr. Dewsnup in person or request an independent medical examination.") (heart attack/neuropathic pain) (also involving Dr. Haller); *Clark v. Unum Life Ins. Co. of Am.*, 2018 WL 4931935, *16 (M.D. Tenn. Oct. 10, 2018) (criticizing Dr.

Norris for his "conclusory findings" and "selective review" of the evidence) (lupus/fibromyalgia/neuropathy) (also involving Dr. Bress); *Fleming v. Unum Life Ins. Co. of Am.*, 2018 WL 6133859, *6 (C.D.Ca. Nov. 20, 2018) (where Dr. Norris claimed objective testing was not time-relevant and dismissed treating physician's opinion as not based on objective findings, the court found Dr. Norris did not have the credentials to review plaintiff's claim based on pain, stating: "While Unum is not required to send a claimant to an in-person examination, the Court declines to credit Dr. Norris's opinion over those of the medical evaluators who consistently examined Fleming in person.") (neck/shoulder/arm pain); *Hannon v. Unum Life Ins. Co. of Am.*, 988 F. Supp. 2d 981, 985-86, 992 (S.D. Ind. 2013) (rejecting Dr. Norris' opinion as "nothing short of arbitrary") (Ehlers–Danlos syndrome).

For example, many cases filed against Unum in Massachusetts, including the current case, involve Dr. Norris' comment on the plaintiff's evidence of disability despite varying illnesses: *Bremner v. Unum Group*, 22-cv-1079-MGM (Lyme disease); *Moseley v. Unum Life Ins. Co. of Am., et. al*., 22-cv-40079-RGS (Lyme disease); *Schaeffer v. Unum Group, et. al.*, 22-cv-11359-WGY (chronic inflammatory demyelinating polyneuropathy) (remanded back to Suffolk Superior Court on October 17, 2022); C*ampbell v. Unum Group, et. al*. 21-cv-11637-PBS (cause of back abnormalities); *MacNaughton v. The Paul Revere Life Ins. Co. et. al.*, 19-cv-40016-TSH (optic nerve injury). There are many other cases nationwide where Dr. Norris never finds an ERISA participant disabled.

**E. Rhonda Jellinek's vocational report accurately found Mr. Rogers' occupation was medium duty.**

Rhonda Jellinek, a vocation expert, explained in detail why Mr. Roger's occupation was "medium duty" rather than "light duty." (IX, pp. 3873-96). Ms. Jellinek provided a detailed

summary of Mr. Rogers' medical conditions, the resources she utilized, records reviewed, discussion of reported side effects of medications, symptoms of illnesses, educational discussion, detailed occupational analysis of Mr. Rogers job against known occupational databases, critique of Unum calling Mr. Rogers a "chemist" and later a scientist. Unum criticized her for using different databases. But the sole database relied on by Unum was not accurate. *See Gilchrest v. Unum Life Ins. Co. Of America*, 255 Fed. App'x 38 (6th Cir. 2007) (ruling that reliance on a DOT job description was arbitrary and capricious based on the disconnect between the insurer's use of an analogous job description at a "light" exertional level, and the "medium" lifting requirements the plaintiff was routinely performing). Ms. Jellineck's report is thorough, detailed (IX, pp.3892-93).

**Vocational Analysis:**
It is clearly evident that Mr. Rogers is completely precluded from performing his own occupation as a Materials Scientist/Material Failure Analyst and meets the definition of Disabled under his policy. Based on a review of the medical records including the report form Dr. Rapoport, Mr. Rogers cannot perform the lifting, walking, standing, reaching, handling and fine finger dexterity required of the occupation. Again, the occupation is at the medium physical demand level due to the material failure analysis work that is required.

In addition, given the extensive medical records and the vocational interview conducted, it is opined that Mr. Rogers does not possess the Critical Vocational Behaviors required to sustain any work on a full-time basis.

*Critical Vocational Behaviors*, and the ability to meet the general conditions of employment, continue to be considered essential by vocational rehabilitation professionals relative to the ability of individuals to obtain and maintain employment. (*Krantz, G. Critical Vocational Behaviors. Journal of Rehabilitation; July-August, 1971*)

Examples of these Critical Vocational Behaviors include:

- *Working quickly and efficiently, with the ability to meet deadlines*
- *Meeting employer standards and expectations for work quality and productivity*
- *Completing a normal workday and workweek without interruptions due to symptoms*
- *Working at a consistent pace without an unreasonable number or length of breaks*
- *Regular attendance*

**Conclusion:**
Based on a review and assessment of Mr. Rogers's vocational profile including his age, education, work experience and skills, combined with the documentation from his treating providers about his physical and cognitive status, treatment and current work limitations, it is strongly opined that Mr. Rogers is, and has consistently been, unable to perform the material duties of his own occupation a Senior Scientist on a full-time basis since he initially stopped working in February of 2020. Based on the clearly outlined limitations (including the report from Dr. Rapoport, the Independent Medical Examiner),

which document very significant physical limitations and acknowledges limitations with reaching, handling and fine finger dexterity, as well as the progressive nature of Mr. Rogers's illness, it is my vocational opinion that vocational disability is unlikely to change for the foreseeable future.

My vocational opinion is rendered when considering all medical opinions regarding Mr. Rogers's work capacity, including Dr. Rapoport's. Vocational experts integrate comprehensive medical information and one's work history to assess skills, marketability and employability. Vocational experts are skilled in interpreting work limitations and capacities in terms of employability, sustainability and earning potential.

As a vocational consultant, I have a Master's Degree in Rehabilitation Counseling and hold national certification as a Certified Rehabilitation Counselor. I also hold state certifications in Massachusetts and Rhode Island. In addition, I have provided expert vocational expert testimony in numerous court systems and have been accepted as a vocational expert in state and federal courts for more than 27 years.

Submitted by;

Rhonda L. Jellenik, MA, CRC, LRC
Certified Rehabilitation Counselor

In contrast, Unum's grounds to call Mr. Roger's occupational duty light is not credible. Also, Unum failed to give adequate consideration to cognitive duties of his occupation and weighing those against known limitations.

## I. Unum failed to conduct itself with "higher than marketplace" standards as an ERISA fiduciary.

When the ERISA fiduciary is the benefit decider and benefit payer, the court must place its thumb on the scale questioning the insurance fiduciary's independence when it fails to provide for full and fair review required by the Department of Labor regulations and ERISA common law. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008) ("conflict ... should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision"). Chief Justice Robert's concurring opinion cited

Unum's checkered past explained in this judicial district in *Radford Trust v. First Unum Life Ins. Co. of Am.*, 321 F. Supp. 2d 226, 247 (D. Mass. 2004). *Id*. at 123. So did Judge Woodlock last year. *See Host v. First Unum Life Ins. Co.*, 569 F. Supp. 3d 48, 59–60 (D. Mass. 2021) (having found that Unum acted in bad faith, and not as a true fiduciary, I conclude that Unum is demonstrably unable to exercise its discretion honestly and fairly). Unum's history of parsimonious claim denials is well documented. *See* Phillip W. Thomas, *Fifteen Years Later - Did The Unum Group Improve Its ERISA Claims Handling Practices?* 39 Mississippi College Law Review, 199 (2021) (Doc No. 8, pp. 67-105 of 295). Also, Unum's IDI Director Scorecard and IDI Weekly updates unmasks focusing claims personnel on the financial cost of claims. (Doc No. 8, pp. 107-109 of 295).

There are many factors that require the court to put its thumb on the scale against an ERISA fiduciary paying benefits from its own assets. This begins with "procedural unreasonableness" as a factor. *Lavery v. Restoration Hardware Long Term Disability Benefits Plan*, 937 F.3d 71, 78 (1st Cir. 2019). Inconsistent positions, such as in this case awarding benefits for the entire STD claim period and then denying LTD benefits contending in the same time frame Mr. Rogers was not occupationally impaired. *Id*. at 79-81. A prime example of this conduct is *Roehr v. Sun Life Assurance Co. of Canada*, 21 F.4th 519, 525-26 (8th Cir. 2021) (finding it an abuse of discretion to deny benefits based on the same records used to award benefits). Other irregularities included: assisting in the unlicensed practice of medicine in Massachusetts; insisting that Mr. Rogers' occupation was a chemist; ignoring sworn testimony and more. In totality, these factors require questioning the neutrality of Unum's overall decision making, and weigh in favor of discounting all of Unum's determinations.

## CONCLUSION

For all these reasons, the court should grant all the relief which Mr. Rogers seeks in his Motion for Judgment.

**ROBERT M. ROGERS, Ph.D.**

Respectfully submitted,

*/s/ Jonathan M. Feigenbaum, Esq.*

Jonathan M. Feigenbaum, Esq.
184 High Street, Suite 503
BBO 546686
Boston, MA 02110
Phone: (617) 357-9700
Email: jonathan@erisaattorneys.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 14, 2023, a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

*/s/Jonathan M. Feigenbaum*
Jonathan M. Feigenbaum